**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SCOTT PETERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 4809** |
| | ) | |
| **KENYON BAILEY, JOHN BALDWIN,** | ) | |
| **ELWOOD BETHEA, DR. ARTHUR** | ) | |
| **DAVIDA, DR. ROZEL ELAZEGUI,** | ) | |
| **DR. ARTHUR FUNK, ILLINOIS** | ) | |
| **DEPARTMENT OF CORRECTIONS,** | ) | |
| **NICHOLAS LAMB, JEROME** | ) | |
| **NICKERSON, RANDY PFISTER,** | ) | |
| **ATHENA ROSSITER, KEVIN** | ) | |
| **VILLEGAS, WEXFORD HEALTH** | ) | |
| **SOURCES, INC., and JON WILES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

      Scott Peters, a former inmate at Stateville Correctional Center's Northern

Reception Center (NRC), has sued former and current members of the prison's medical

staff and employees of Wexford Health Sources, Inc., which provides healthcare

services at the prison (the Wexford defendants) under 42 U.S.C. § 1983. Peters alleges

that the individual Wexford defendants, Dr. Arthur Davida, Dr. Rozel Elazegui, Dr.

Arthur Funk, and nurse Athena Rossiter, all healthcare providers from whom Peters

sought medical attention, were deliberately indifferent to his serious medical needs, in

violation of the Eighth Amendment. He has also asserted a claim against Wexford itself

for maintaining a policy or custom of failing to coordinate medical treatment for inmates.

Wexford and the individual Wexford defendants have moved for summary judgment.

**Facts**

The following facts are undisputed except where otherwise noted. Peters was an inmate at the NRC from June 2015 to March 2016. He says that during his incarceration, he submitted over a hundred grievances regarding deficient medical care.

When Peters arrived at the NRC on June 26, 2015, he underwent a medical intake screening. The intake nurse noted that Peters brought with him two crutches and a wheelchair from a previous correctional facility. As part of the medical intake procedure, Dr. Arthur Davida performed a physical examination of Peters. Dr. Davida is a medical doctor who was employed by Wexford and worked at Stateville from June to September 2015.

Wexford is a private corporation that provides healthcare services to inmates at Illinois Department of Corrections prisons pursuant to a contract with the State of Illinois. Wexford employs the doctors, nurses, and physician's assistants who work in the healthcare unit at Stateville. During the physical examination performed by Dr. Davida, Peters self-reported, among other health issues, an umbilical hernia, blood in his stool, and a history of colon polyps.

Peters's claims in this case involve four medical conditions—a MRSA infection, a shoulder injury, an umbilical hernia, and colon polyps/bloody stool. The parties dispute whether each of the defendants Peters has sued actually knew of each of these conditions and whether each was deliberately indifferent to his medical needs. More generally, they dispute which defendants were personally involved in Peters's medical care for each of his medical conditions.

2

### A.    MRSA infection

Before July 6, 2015, while incarcerated at Stateville, Peters contracted a methicillin-resistant staphylococcus aureus (MRSA) infection on his left buttock.  On July 6, 2015, a Wexford staff member treated Peters's MRSA infection with Bactrim, an antibiotic.  After the July 6 visit, Dr. Davida became responsible for treating Peters's MRSA infection.  The parties appear to agree that Dr. Davida was the only Wexford defendant named in this lawsuit who was involved in Peters' medical care regarding the MRSA infection.

On July 17, 2015, Dr. Davida examined Peters again.  Peters's perirectal abscess—a manifestation of the MRSA infection—was not responding to Bactrim.  A lab culture taken from the abscess on July 14 tested positive for MRSA and indicated that Clindamycin, a different antibiotic, could destroy the particular strain of MRSA that infected Peters.  During the July 17 visit, Dr. Davida performed a physical examination of Peters, prescribed Clindamycin, and ordered daily showers, daily dressing changes with peroxide and Betadine, and ordered a follow-up visit in one week.  On July 17, Peters's infection had a one-centimeter wound, and the abscess was fifteen centimeters in diameter.

On July 24, during a follow-up visit with Peters, Dr. Davida noted decreasing swelling and redness on his left buttock ulcer, prescribed narcotic pain medication and a muscle relaxer, and instructed Peters to finish out the Clindamycin prescription.  The parties disagree about the extent to which Peters's condition improved when he followed up with Dr. Davida two weeks later, on August 6.

The Wexford defendants contend that on August 6, Peters's left buttock ulcer

"was much improved."  Defs.' Ex. D (Davida Dep. Tr.) at 131:4-13.  Peters disputes this characterization of his wound; he contends that Dr. Davida's notes do not reflect that he measured the ulcer at the August 6 visit.  When Peters was seen by a physician assistant's on August 21, 2015, his ulcer had grown to a "3 c[entimeter] wound."  Pl.'s Ex. 2 (Wexford Notes) at 000520.  During his deposition, Dr. Davida contended that based on the August 21 results, it was "difficult to say one way or the other whether the wound is improving or not improving."  Davida Dep. Tr. at 129:10-130:3.  During the August 21 visit, Dr. Davida again prescribed Clindamycin.  On August 23, a lab culture revealed that Peters's MRSA infection was resistant to Clindamycin, but Dr. Davida did not modify his treatment of Peters based on this new information.  On September 15, 2016, Peters filed a grievance complaining about continued pain from the infection on his left buttock.  Two additional grievances Peters filed in September and October 2015 reflect that his MRSA infection had not subsided by then.

The parties dispute whether Dr. Davida's treatment of the MRSA infection was appropriate.  The Wexford defendants contend that Peters's use of a wheelchair explains the "poor prognosis on healing [from the MRSA infection]."  Defs.' Stat. of Facts ¶ 25.  But Peters disputes that he was even using a wheelchair while he was being treated for the MRSA infection.

## B. Shoulder injury

On December 4, 2015, Peters fell and suffered an injury to his right shoulder, among other injuries.  On that date, Dr. Arthur Funk examined Peters, ordered narcotic pain medication, and ordered x-rays of the right shoulder.  Peters remained in the Stateville infirmary until December 16.

4

On December 7, 2015, Dr. Funk saw Peters again. The parties dispute whether Peters's shoulder pain and mobility had improved by the time of this visit. The defendants contend that Peters had increased movement in his shoulder and had a continued positive response to the narcotic pain medication Dr. Funk prescribed. Peters contends that he was not improving and that he continued to have shoulder pain and limited shoulder mobility.

On December 11, Dr. Funk examined Peters again and recorded in his notes that Peters's shoulder pain was decreasing. Peters contends, however, that his shoulder was still painful at the time of this visit. On December 14, Peters saw Dr. Funk again and reported right shoulder and right interscapular pain. Dr. Funk prescribed Tylenol 3, a narcotic pain medication.

On December 16, 2015, Peters was scheduled to be transported for an x-ray. The defendants contend that Peters refused to be transported. Peters says that he was unable to climb into the van because "there [was] nothing to hold onto to climb into the van" and that Wexford personnel failed to accommodate his stated inability to get into the van. Wexford Notes at 000557. On that day—Dr. Funk's last day at Stateville—Dr.. Funk discharged Peters. Peters contends that he was still experiencing significant shoulder pain and limited mobility.

On December 18, 2015, Peters received the results of his x-rays, which were negative for a fracture. On January 7, 2016, Dr. Elazegui became Peters's treating physician. On a medical visit that day, Peters complained to Dr. Elazegui about shoulder pain. Peters contends that he could not complete a range of motion exam due to "severe discomfort," but the defendants dispute this, contending that "Plaintiff refused

to cooperate with Dr. Elazegui's range of motion examination."  Defs.' Stat. of Facts. ¶ 63.  Dr. Elazegui's notes state that "no signs of discomfort [were] noted" when Peters leaned on his right shoulder and repositioned his sling, but Peters disputes this, contending that he repeatedly reported shoulder discomfort.  Wexford Notes at 000564.

## C.    Umbilical hernia

In 2014, before coming to the NRC, Peters was diagnosed with an umbilical hernia.  When he arrived at Stateville in June 2015, he self-reported his hernia to Dr. Davida during the intake physical examination.  The parties dispute whether Peters's umbilical hernia was asymptomatic and reducible[1] while he was incarcerated at Stateville.  Peters testified that during his incarceration at Stateville, his hernia continued to grow and became non-reducible and that he consistently experienced what he contends were hernia-related symptoms—including abdominal pain, constipation, nausea, and vomiting.

The parties agree that Dr. Davida and Dr. Funk were personally involved in treating Peters with regard to his hernia.  They dispute whether Dr. Elazegui and nurse Rossiter participated in treatment for the hernia.

On August 6, 2015, during a medical visit with Dr. Davida, and September 3, 2015, during a visit with an unspecified physician, Peters complained of what he contends are hernia-related symptoms, including constipation.  On September 22, 2015, Peters complained of sharp pains in his intestines and a stabbing pain below his rib cage.  His contention in this case is that despite his repeated reports of abdominal pain,

---

[1] An umbilical hernia is reducible if the part of the intestine protruding through the abdominal wall can be pushed back into place.

the defendants took no action to treat him for the hernia. In 2018, after Peters was transferred to a different prison, his hernia was surgically repaired.

**D.    Colon polyps/bloody stool**

During the intake physical examination with Dr. Davida on June 26, 2015, Peters self-reported a history of colon polyps,[2] including a prior colonoscopy and the removal of several benign colon polyps in 2013, as well as current issues with bloody stool and constipation. Peters contends that Dr. Davida and Dr. Funk were both involved in his medical care regarding colon polyps. The defendants contend that Peters's complaints relating to bloody stool were unrelated to colon polyps and that neither Dr. Davida nor Dr. Funk knew of or participated in treating Peters for this condition.

Peters says that he filed numerous grievances in August and September 2015 regarding bloody stool. On September 28, 2015, a Wexford physician referred Peters to Dr. Funk "when available." Wexford Notes at 000521. Peters saw Dr. Funk on December 4 for his shoulder injury. Peters contends that during this visit, his bloody stool issue was not addressed. Again, his contention is that the defendants ignored his complaints and failed to provide him with diagnostic tests or treatment for the symptoms and condition he reported. The evidence reflects that after Peters was transferred to a different prison, he received a colonoscopy.

**Discussion**

Peters filed this lawsuit on June 26, 2017. In count 1 of his third amended complaint, he alleges that each of the Wexford defendants was deliberately indifferent to his objectively serious medical needs in violation of the Eighth Amendment. In the

---

[2] Colon polyps are growths of cells inside the colon or rectum.

same count, Peters also asserts a claim against Wexford under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The defendants have moved for summary judgment on count 1. Peters's other claims are against other defendants, specifically the Illinois Department of Corrections and certain IDOC employees. The Court understands that Peters has settled with those parties.

Summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018). The Court views the evidence and draws all reasonable inferences in the light most favorable to Peters, the non-moving party.[3] *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019). To survive summary judgment, Peters must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

## A.    Eighth Amendment claim against individual defendants

The Eighth Amendment's prohibition on cruel and unusual punishment requires

---

[3] The defendants have objected to many of Peters's responses to the defendants' Local Rule 56.1(b)(3)(C) statements of fact, contending they are argumentative and that he improperly added additional facts without submitting his own statement of additional facts. Parties filing opposing motions under Local Rule 56.1 are required to file a statement of any additional facts that require the denial of summary judgment. *See* N.D. Ill. LR 56.1(b)(3). The Court declines to exercise its discretion to ignore Peters's additional asserted facts. *See Taylor v. Bd. of Educ. of City of Chi.*, No. 18 C 7874, 2020 WL 5076718, at *4 n.6 (N.D. Ill. Aug. 27, 2020) (Kennelly, J.) (denying defendants' request to strike many of the plaintiff's responses to the defendants' Local Rule 56.1(a)(3) statement of facts on the grounds that he did not submit a statement under Local Rule 56.1(b)(3)(C)); *see also Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

states to provide adequate medical care to inmates. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Giles*, 914 F.3d at 1048-49. To prevail on a claim for violation of the Eighth Amendment relating to medical care, Peters must show "that he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Giles*, 914 F.3d at 1049. Peters must also show that the official's deliberate indifference caused him to suffer some injury. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

As the Court has indicated, Peters's claims against the Wexford defendants involve four medical conditions: a MRSA infection on Peters's left buttock; a right shoulder injury; an umbilical hernia; and colon polyps/bloody stool. He contends that he received grossly inadequate medical treatment for each.

### 1.    Objectively serious medical conditions

The first issue is whether each of Peters' conditions is objectively serious. The Wexford defendants do not dispute that Peters's MRSA infection, umbilical hernia, and colon polyps are objectively serious medical conditions. They dispute only whether Peters's right shoulder injury is an objectively serious medical condition. A medical condition is objectively serious if the condition is "one that a physician has diagnosed as needing treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019). It "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Palmer*, 928 F.3d at 564.

The defendants contend that Peters's "fall injuries," including the shoulder injury, are "minor aches and pains or a tiny scratch." Defs.' Summ. J. Mem. at 4. But Dr. Funk prescribed Peters with narcotic pain medication to treat the injury. Even without more, a reasonable jury could infer from this that the shoulder injury was an objectively serious medical condition: a doctor at Stateville determined that it necessitated medical treatment. But there is more; Peters contend that the injury caused him ongoing pain and limited his range of motion. A reasonable jury could find this was an objectively serious medical condition. *See Holmes v. Lochard*, No. 17 C 1160, 2018 WL 5815518, at *4 (C.D. Ill. Nov. 6, 2018) ("Plaintiff's self-described [shoulder] pain and limited range of motion allow an inference that he [had an objectively serious medical need]"); *see also Medrano v. Smith*, 161 F. App'x. 596, 598 (7th Cir. 2006) ("Medrano's back and shoulder conditions, both of which required previous surgery and are now causing him severe pain, obviously qualify [as serious medical needs under the Eighth Amendment]"); *Grovogel v. Racine Cty. Jail*, No. 16 C 1274, 2018 WL 2135020, at *2 (E.D. Wis. May 9, 2018) ("The court finds that the plaintiff's alleged shoulder injury is a serious medical need").

### 2. Deliberate indifference

The next issue is whether Peters has presented sufficient evidence to permit a reasonable jury to find that each Wexford defendant knew about yet deliberately disregarded a substantial risk of harm to his health. *Palmer*, 928 F.3d at 564. The Wexford defendants argue that none of them "displayed the required culpability to sustain a claim of deliberate indifference" toward any of Peters's medical conditions and that they are entitled to deference in their treatment decisions. Defs.' Summ. J. Mem. at

10

8.  In the prison context, a medical professional is entitled to deference in treatment decisions "unless no minimally competent medical professional would have so responded under the circumstances at issue."  *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).  Nevertheless, "if a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it."  *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016).  In that situation, a "medical professional's treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  *Id.*  The Court addresses this on a condition-by-condition and defendant-by-defendant basis.

### a.    MRSA infection

First, the Wexford defendants contend that Dr. Davida's treatment of Peters's MRSA infection met the standard of care for correctional medicine and that no reasonable jury could find the defendants were deliberately indifferent to a substantial risk of harm to Peters.  Their argument principally relies on the testimony of one of their experts, Dr. Kennon Tubbs.  Specifically, the defendants argue that "Dr. Tubbs reviewed Dr. Davida's medical record and deposition testimony; advised that he would responded [sic] as Dr. Davida did if this was his patient; and he fully supported Dr. Davida's treatment of Plaintiff, including Dr. Davida's treatment, of Plaintiff's MRSA infection."  Defs.' Summ. J. Mem. at 9.

In contrast, Peters contends that Dr. Davida knew about yet disregarded a substantial risk of harm to his health by failing to adequately treat the MRSA infection on

Peters's left buttock. On August 21, about five weeks after Dr. Davida first saw Peters for the MRSA infection, Peters was seen by a physician's assistant and prescribed Clindamycin, an antibiotic, to treat the infection. Two days later, lab culture results revealed that Peters's MRSA infection Peters was resistant to Clindamycin. Peters contends that despite this, Dr. Davida did not change the course of treatment for the MRSA infection.

There is evidence that would permit a finding that the MRSA infection continued to persist due to the claimed ineffective treatment. In September 2015, Peters filed a grievance complaining that he "still ha[d] an infection in [his] left hip and buttock from whatever bit me … it keeps me in pain." Pl.'s Ex. 3 (Peters Grievances) at 000064. In October 2015, three months after Dr. Davida first treated Peters, Peters filed a grievance regarding the sore on his buttocks; he complained that his left buttock had "still not healed and [was] leaking green stuff." *Id.* at 000066. A reasonable jury could find that despite this, no different medication was prescribed and no further treatment was rendered.

Based on the evidence cited by Peters, a reasonable jury could find that Dr. Davida was deliberately indifferent to a substantial risk of harm in that he ultimately "turn[ed] a blind eye" to Peters's MRSA infection and "persist[ed] in a course of treatment known to be ineffective." *Gentry*, 65 F.3d at 561; *Williams v. Obaisi*, No. 17 C 3893, 2020 WL 5026352, at *5 (N.D. Ill. Aug. 25, 2020); *see also Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (finding a genuine factual dispute regarding whether a physician was deliberately indifferent to a prisoner's deteriorating medical condition by persisting with an ineffective course of treatment).

12

### b.     Right shoulder injury

Second, the Wexford defendants argue that Dr. Funk's and Dr. Elazegui's treatment and nurse Rossiter's care of Peters's right shoulder injury met the standard of care for correctional medicine and thus they were not deliberately indifferent to a substantial risk of harm to Peters. Peters contends, however, that the treatment he received was deficient and that he continued to experience shoulder pain and mobility issues for months. He contends that as a result, he can no longer use his crutches[4] and thus requires a wheelchair.

The defendants base their arguments on the testimony of their experts, Dr. Kennon Tubbs and Dr. Alan Loren. Specifically, they argue that Dr. Loren "determined that Dr. Funk's conservative treatment of Plaintiff's shoulder injury was appropriate and that Plaintiff's shoulder injury did not require an MRI" and that Dr. Tubbs "agreed with Dr. Funk's course of treatment for Plaintiff's shoulder injury, and advised that he would have provided similar care to Dr. Funk if this was his patient." Defs.' Summ. J. Mem. at 11. They also contend that Dr. Tubbs's testimony demonstrates the adequacy of Dr. Elazegui's treatment of Peters and well as Rossiter's nursing care.

Peters likewise offers the testimony of an expert, Dr. Marc Itskowitz. Dr. Itskowitz challenges the defendants' course of treatment of Peters's shoulder injury and opines that they should have ordered an MRI, provided steroid injections, or referred Peters to physical therapy. The defendants' experts opine that the treatments were unnecessary.

---

[4] Peters arrived at Stateville with two crutches and a wheelchair. Peters uses these assistive devices because of disabilities he was diagnosed with before his incarceration.

Defendants' suggestion that their experts' testimony defeats Peters's claim lacks merit. Peters has presented countervailing expert testimony. The fact that defendants have offered experts who support their course of treatment does not entitle them to summary judgment.

In addition, Peters's deposition testimony thwarts defendants' argument that Peters has pointed to no evidence supporting his allegations against Dr. Funk, Dr. Elazegui, and nurse Rossiter. Peters testified that he informed all three of these defendants[5] about his persistent, painful shoulder condition. This is sufficient to permit a reasonable jury to find that each of these defendants knew yet disregarded a substantial risk to Peters's health. Peters Dep. Tr. at 109:6-11 ("Dr. Funk's the one that wouldn't do nothing about the shoulder…[a]nd he took away my [pain] medications"), 157:20-158:12 ("[I told them at the infirmary that] [m]y knee – well my knee was destroyed, and my shoulder was destroyed, I couldn't move it at all"), 161:9-162:2 ("Dr. Funk gave me Tylenol 3 for about three days, and then he stopped it, maybe four days, and then he stopped it. And then I didn't get any more until the time I left, until I got back down to NRC"), 109:23-110:2 ("[Rossiter]'s the nurse that was harassing me about the handicap van"); 165:3-11 ("the entire time I asked them [healthcare providers in the infirmary] for, to find out if there's ligament damage to my shoulder").

Dr. Funk, the first medical staff member to treat Peters's shoulder injury, ordered

---

[5] The defendants make a conclusory argument, without citing authority, that Dr. Elazegui and nurse Rossiter cannot be held liable with regard to Peters's shoulder injury because their interactions with him were limited in scope and short in duration. The defendants have forfeited this point by asserting it in a cursory and unsupported fashion. That aside, Peters has presented evidence sufficient to permit a reasonable jury to find that Dr. Elazegui and nurse Rossiter knew of his medical needs pertaining to the shoulder injury but ignored the need for treatment.

an x-ray on December 4, 2015, the day that Peters fell and presented in the Stateville infirmary with shoulder pain. Between December 4 and December 16, Peters complained of shoulder pain and immobility to both Dr. Funk and nurse Rossiter, who were responsible for treating him during his confinement in the infirmary. Dr. Funk discharged Peters on December 16, before he had undergone the x-ray, and he provided Peters no further treatment. Although the results of Peters's x-ray were negative, he contends that he continued to suffer shoulder pain and mobility issues after Dr. Funk discharged him on December 16.

After Dr. Funk left Stateville on December 16, 2015, Dr. Elazegui became Peters's treating physician. Dr. Elazegui first evaluated Peters's shoulder injury on January 7, 2016. Peters complained of shoulder pain and limited mobility during this visit, but Dr. Elazegui only instructed Peters to "increase activities" and prescribed him pain killers. Peters contends that he was in pain during the January 7 visit. The Wexford defendants dispute this, relying primarily on Dr. Elazegui's note stating that "no signs of discomfort [were] noted at the visit." Wexford Notes at 000564. Contrary to the defendants' suggestion, a note made by a person accused of deliberate indifference is not conclusive evidence refuting Peters's claim. His testimony that he was in shoulder pain during his first visit with Dr. Elazegui is sufficient to give rise to a genuine factual dispute on this point. *See id.*

The defendants also argue that they are entitled to summary judgment because whether Peters even needed an x-ray is "debatable." Defs.' Summ. J. Mem. at 11. But Peters has offered evidence that would permit a reasonable jury to find that he reported a persistent and painful shoulder injury. Further, Peters contends that the x-ray was not

15

sensitive enough to evaluate for soft tissue injuries he may have suffered. He argues that even though the x-ray did not reveal the cause of his symptoms, Dr. Funk "never followed up, performed further diagnostic treatment, or prescribed any additional treatment." Pl.'s Resp. at 5. As a result, Peters says, his shoulder pain continued.

Peters's expert, Dr. Itskowitz, has opined that the "[b]ecause Wexford staff failed to run appropriate diagnostic tests, the full extent of [Peters's] shoulder injury is not known." Pl.'s Ex. 6 (Dr. Itskowitz Report) at 10. Dr. Itskowitz opined that magnetic resonance imaging (MRI) could have detected a subtle fracture or soft tissue damage, a steroid injection could have relieved Peters's pain, or a referral for physical therapy or orthopedics would have been appropriate upon Peters's discharge from the infirmary. *See id.* at 9.

The Court finds that the evidence presented by Peters, including reasonable inferences, would permit a reasonable jury to find that further testing and treatment regarding his shoulder pain was necessitated and that the failure to follow up constituted deliberate indifference. The issue of whether Peters needed an x-ray or any further treatment is reserved for the jury. *See Greeno*, 414 F.3d at 655 ("The possibility that [the defendants] did not do more for Greeno because they thought he was malingering and did not really have a severe medical need is an issue for the jury").

### c. Umbilical hernia

Third, the Wexford defendants argue that none of them displayed the required culpability to sustain Peters's claim of deliberate indifference toward the umbilical hernia because their treatment complied with the applicable standard of care for correctional medicine.

During Peters's intake physical examination on June 26, 2015, he informed Dr. Davida that he had an umbilical hernia. Dr. Davida documented the hernia in Peters's medical records on that date. Peters asserts that during his incarceration at the NRC, his hernia was "inflamed," "growing," and he was unable to "push it back in." Peters Dep. Tr. at 125:17-20. During medical visits on August 6, 2015 and September 3, 2015, Peters alleges that he complained of hernia-related symptoms, including blood in the stool and constipation.

On September 22, 2015, Peters filed a grievance complaining of sharp pains in his intestines and a stabbing pain below his rib cage. And he says that when he was confined to the infirmary in December 2015 after his shoulder injury, he experienced a hernia attack, in other words, severe pain from the area of the hernia. Peters contends that the defendants should have treated him for the pain and/or evaluated the hernia for surgical repair. It is noteworthy that in 2018, after Peters was transferred from the NRC to Menard Correctional Center, his hernia was surgically repaired. Peters argues that the delay in treatment for his hernia pain amounted to deliberate indifference.

The defendants dispute Peters's argument that he experienced hernia issues at all; they contend that his hernia was "asymptomatic during his entire incarceration at Stateville." Defs.' Summ. J. Mem. at 11. The defendants also cite Dr. Tubbs's and Dr. Loren's expert reports to back their contention that Peters's complaints did not reflect hernia pain because of the location where he reported pain and because umbilical hernias "rarely cause" abdominal pain, nausea, vomiting, and constipation. *Id.*

The defendants' arguments do not provide a basis for entry of summary judgment. Peters has produced sufficient evidence of complaints he made to each of

17

the four defendants regarding issues that a reasonable jury could find are connected to his umbilical hernia. As for defendants' experts' opinions, "rarely" does not mean never. Whether Peters's symptoms were hernia-related, based on their location or based on the pain that hernias of this type may typically cause, is a disputed factual issue to be determined by a jury.

Peters has presented evidence from his deposition testimony, grievances he filed, and hernia-related complaints in his medical record that would permit a reasonable jury to find that he complained of hernia-related pain to all four Wexford defendants in the course of medical treatment that each of them provided to him. Peters Dep. Tr. at 106:15-21 ("Davida was the original doctor I saw upon arriving at NRC…I had hernia problems, and he wasn't taking care of it"); 115:15-19 ("[Davida] wouldn't address my stomach hernia"); 107:4-7 ("[Elazegui]'s another one that would not take care of my hernia issues"); 166:22-167:9 ("I was asking [Dr. Funk] for something to help [with the hernia attack on Dec. 14, 2015] and he [yelled at me and told me to get out of his sight]"); 109:23-110:9 ("I was having a hernia attack basically in the infirmary, and I couldn't get [Rossiter] to help me"); 121:19-24 "[I showed the cookie bag of bloody feces] to [Rossiter] once, I believe, I believe... and that's the one I believe was attributed to the hernia.").

The defendants also appear to contend that Peters's hernia must have been asymptomatic because the surgical and pathology report following his 2018 hernia removal surgery at Menard Correctional Center revealed that his umbilical hernia was not strangulated. (When a hernia is strangulated, the part of the intestine affected by the hernia loses blood supply.) But evidence that the hernia was not strangulated when

18

it was removed in 2018 is not fatal to Peters's claim given the evidence that he suffered hernia-related pain in August, September, and December 2015—three years earlier—and that this persisted due to the absence of treatment by the defendants. *See Johnson v. Wexford Health Source, Inc.*, No. 17 C 3213, 2020 WL 2128735, at *3 (N.D. Ill. May 5, 2020) ("delaying treatment of a non-life threatening, but painful, condition for nonmedical reasons can constitute deliberate indifference … even if the delay in treatment does not exacerbate the injury"). A reasonable jury could find that the defendants were deliberately indifferent to Peters's umbilical hernia because "the surgery, which was ultimately performed, was unnecessarily delayed in the face of worsening symptoms and ongoing complaints of pain." *Id.*

In short, Peters has presented sufficient evidence to permit a reasonable jury to find in his favor against each of the Wexford defendants on his deliberate indifference claims regarding treatment of his hernia.

### d. Colon polyps/bloody stool

The final medical condition at issue in this case is Peters's colon polyps and bloody stool. The defendants contend that they did not display the required culpability to sustain a claim of deliberate indifference because their treatment complied with the standard of care for correctional medicine.

During Peters's intake physical examination on June 26, 2015, he informed Dr. Davida that he had a history of colon polyps and that he was currently suffering from bloody stool. Dr. Davida documented these conditions in Peters's medical records on that date. Peters contends that while he was incarcerated at the NRC, he consistently suffered bloody stool, which he argues is a symptom consistent with colon polyps.

19

During medical visits on August 6, 2015, September 3, 2015, and September 28, 2015, Peters complained of bloody stool. In response to these complaints, the treating physician (who is not a defendant in this case) referred Peters to Dr. Funk "when available." Wexford Notes at 000521. Peters asserts that he filed at least fifteen grievances asking to see a doctor regarding his bloody stool problem.

Peters contends that despite his complaints to Dr. Davida regarding bloody stool, Dr. Davida did not follow up or treat this condition while treating Peters for MRSA in August and September 2015. Peters also claims that Dr. Funk did not address his bloody stool-related medical issues when he saw Peters for the shoulder injury on December 4, 2015. And Peters's expert, Dr. Itskowitz, has opined that the defendants failed to monitor and treat Peters's colon polyps.

In April 2018, after transferring to Menard Correctional Center, Peters underwent a colonoscopy. The colonoscopy was negative for colon cancer and colon polyps. The Wexford defendants rely on this to contend that Peters cannot sustain a claim based on failure to treat him for colon polyps while he was incarcerated at the NRC.

Peters argues that because the defendants performed no diagnostic tests relating to these matters while he was incarcerated at the NRC, there is no basis to conclude that his complaints of abdominal pain, blood in his stool, and constipation were unrelated to colon polyps. Furthermore, Peters's expert, Dr. Itskowitz, has opined that the Wexford staff failed to treat Peters's bloody stool problem and thereby risked him suffering from not only colon polyps, but also other serious symptoms, such as rectal bleeding, abdominal pain, constipation, and diarrhea. *See* Dr. Itskowitz Report at 7-8. Peters's numerous grievances show that he did make complaints regarding many

20

of these medical issues, including rectal bleeding, constipation and other gastrointestinal symptoms. Furthermore, Peters explained in one grievance regarding his colon polyps that he had a family history of colon cancer, which, Dr. Itskowitz opines, increases the chance that any colon polyps Peters had could become malignant. *See id.* at 7.

The Wexford defendants point to Dr. Tubbs's and Dr. Loren's expert reports to refute Peters's complaints of colon polyps. They contend that Peters's complaints of bloody stool "were not related to colon polyps" and that "it was not medically indicated for any of the treatment providers at Stateville NRC to ordered [sic] a colonoscopy for Plaintiff." Defs.' Summ. J. Mem. at 12.

Whatever merit the defendants' arguments may have regarding colon polyps in particular, they miss the mark with regard to the symptoms Peters reported. Although Peters's April 2018 colonoscopy was negative for colon polyps, that does not absolve the defendants from conducting tests or treating him regarding bloody stool, which could have resulted from colon polyps or from other significant medical conditions. Peters has shown that there is a genuine dispute regarding the Wexford defendants' deliberate indifference to his painful symptoms, including blood in his stool, which caused him significant pain. The Wexford defendants have not demonstrated otherwise. A reasonable jury could find that Peters suffered harm because the individual Wexford defendants delayed and failed to adequately treat his symptoms.

### e. Totality of Peters's care

The defendants contend that "the totality of the medical care received by this Plaintiff does not support an inference of deliberate indifference by any Wexford

21

Defendant."  Defs.' Summ. J. Mem. at 12.  The Court disagrees.  "Viewing the *entire*

record," Peters has identified "significantly probative evidence that the defendants knew

of a serious medical risk" to him and that "the defendants disregarded such a risk."

*Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999).  For

this reason, Peters has shown sufficient evidence of deliberate indifference—more fully

discussed above—to avoid summary judgment.  *See id.*

### B.    Peters's *Monell* claim

Peters's claim against Wexford is based on the theory of municipal liability

described in the *Monell* case, which the Seventh Circuit has "held applies in § 1983

claims brought against private companies acting under color of state law."  *Walker v.*

*Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019).  To survive summary

judgment on his claim against Wexford, Peters must point to evidence that would permit

a reasonable jury to find "(1) an express policy that causes a constitutional deprivation

when enforced; (2) a widespread practice that is so permanent and well-settled that it

constitutes a custom or practice; or (3) an allegation that the constitutional injury was

caused by a person with final policymaking authority."  *Spiegel v. McClintic*, 916 F.3d

611, 617 (7th Cir. 2019).

Peters contends that the delays in effective treatment were part of a widespread

policy or practice to help meet Wexford's cost-cutting goals.  But Peters has cited no

evidence of this other than his own experience.  *See Shields v. Ill. Dep't of Corrs.*, 746

F.3d 782, 796 (7th Cir. 2014) (affirming summary judgment where plaintiff could only

point to his own experiences and finding "[s]uch isolated incidents do not add up to a

pattern of behavior that would support an inference of a custom or policy, as required to

22

find that Wexford as an institution/corporation was deliberately indifferent to Shields's needs"); *Williams*, 2020 WL 5026352, at *6–7 (discussing *Shields*); *cf. Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) (denying summary judgment where, in addition to personal experience, plaintiff offered jail employee testimony about systematic delays in treatment and delays inherent in treatment procedures). Though there are certainly cases in which a single plaintiff's experiences might be sufficient to allow a reasonable inference of a policy or custom, *see generally Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 409 (1997), this is not such a case. *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("it is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience"). Wexford is entitled to summary judgment on Peters's *Monell* claim.

### Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment [dkt. no. 138] as to defendants Dr. Rozel Elazegui, Dr. Arthur Funk, and nurse Athena Rossiter with regard to the treatment of plaintiff's MRSA infection; as to defendant Dr. Arthur Davida with regard to the treatment of plaintiff's shoulder injury; as to defendants Dr. Elazegui and nurse Rossiter with regard to the treatment of plaintiff's colon polyps; and as to Wexford Health Sources, Inc., with regard to plaintiff's *Monell* claim. The Court otherwise denies defendants' motion.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  September 18, 2019